Paul L. Stoller (016773)
paul.stoller@gknet.com
Lincoln Combs (025080)
lincoln.combs@gknet.com
GALLAGHER & KENNEDY, P.A.
2575 E. Camelback Road
Phoenix, AZ 85016
Telephone: 602-530-5000
Facsimile: 602-530-8500

Randall K. Pulliam
rpulliam@cbplaw.com
E. Lee Lowther III
llowther@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR 72201
Telephone: (501) 312-8500
Facsimile: (501) 312-8505
(*pro hac vice* applications to be filed)

Irwin B. Levin
ilevin@cohenandmalad.com
Richard E. Shevitz
rshevitz@cohenandmalad.com
Vess A. Miller
vmiller@cohenandmalad.com
Lynn A. Toops
ltoops@cohenandmalad.com
COHEN MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
(*pro hac vice* applications to be filed)

Counsel for Plaintiffs and
the Putative Class

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| JOE WEINGARTEN and DARRELL HUNTER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LIFELOCK, INC.,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>1. VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1522(A))<br><br>2. BREACH OF CONTRACT<br><br>3. DECLARATORY JUDGMENT<br><br>4. UNJUST ENRICHMENT |

For their Complaint, Plaintiffs Joe Weingarten and Darrell Hunter, on behalf of themselves and all other persons similarly situated, against Defendant LifeLock, Inc. ("Defendant" or "LifeLock" or the "Company") allege as follows:

## INTRODUCTION

1.      LifeLock aggressively markets "identity theft protection" via numerous channels including television, radio, online, and contracted affiliates. However, LifeLock fails to deliver a product that fulfills the numerous promises made in its advertisements.

2.      On two prior occasions, the Federal Trade Commission ("FTC") has sued LifeLock related to false representations made in LifeLock advertising. As a result of those FTC suits, LifeLock is enjoined from making misleading statements concerning the nature of its service. Despite the clear prohibition, LifeLock continues to market its product in a manner that misstates the actual services it is able to offer to consumers.

3.      LifeLock offers three levels of service – Standard, Advantage, and Ultimate Plus. The price ranges from $9.99 per month for Standard up to $29.99 per month for Ultimate Plus. All three plans share certain purported benefits, including the "Million Dollar Protection Package" and "LifeLock Identity Alert." The more expensive plans offer additional purported services such as notifications about "Cash Withdrawals, Transfers and Large Purchases" and "New Bank Account Applications."

4.      All three of these plans claim to offer two types of protection from identity theft: (1) protection and notification if a plan member's personally identifiable information ("PII") is stolen and/or used to fraudulently obtain credit, and (2) reimbursement and assistance on the back end if indeed a plan member is the victim of identity theft. LifeLock states "Identity theft protection is hard. We make it easy for you."

5.      In reality, LifeLock does not deliver on these advertising promises. As a result, Plaintiffs paid hundreds of dollars for a product that not only provided them no meaningful protection from identity theft, but actually created a false sense of security that their interests were being monitored. Further, after Plaintiff Weingarten personally uncovered that his social security number and personal credit was fraudulently used to

2

open credit accounts on multiple occasions, LifeLock refused to offer assistance in fixing the problem.

6.      LifeLock did not notify Plaintiff Weingarten that a false change of address had been filed under his name with the United States Postal Service ("USPS"). In the listed benefits of each of the three plans, LifeLock specifically lists "Address Change Verification" as an area that it monitors, stating "LifeLock lets you know of changes in address requests linked to your identity." In fact, LifeLock is unable to accurately track this information and, as a result, did not notify Plaintiff Weingarten that credit accounts were opened in his name using this false change of address.

7.      Once Plaintiff Weingarten uncovered these accounts, he notified LifeLock and requested assistance in repairing his credit. While LifeLock claims "if you become a victim of identity theft, a U.S.-based Identity Restoration Specialist will be dedicated to your case from start to finish," LifeLock gave Plaintiff Weingarten no assistance in closing these accounts, paying costs associated with them, or otherwise clearing up the damage done to his credit. Likewise, LifeLock failed to provide identity theft victim assistance to Plaintiff Darrell Hunter when he disputed a credit inquiry.

8.      The fact that LifeLock did not uncover these uses of Plaintiff Weingarten's address and personal credit to his detriment (either before or after it occurred) is not an anomaly. In fact, it is typical of LifeLock service, as the company monitors only a tiny percentage of all sources of credit applications – i.e., banks, credit cards, retail. As a result, LifeLock has no ability to deliver upon the advertising promises it makes because the vast majority of credit applications (and thus fraudulent account openings) are not monitored by LifeLock.

9.      In light of LifeLock's history of making advertising claims it had no ability to honor, the FTC and 35 state Attorneys General sued LifeLock in this district. In order for LifeLock to continue to operate, it agreed to a permanent injunction to modify its advertising language. LifeLock is presently violating that injunction (the "FTC Permanent Injunction") in multiple ways by misrepresenting the true nature of its product.

10. In addition to the misrepresentations contained in LifeLock's advertising via television, radio, and its website, LifeLock markets its product through numerous "affiliates," which operate online. These affiliates sign agreements with LifeLock to receive a commission in exchange for driving web traffic to LifeLock's website to sign up as new customers. On information and belief, LifeLock approves the content on those websites. However, LifeLock allows those affiliates to make patently false representations about the scope and quality of the product that LifeLock offers. As a result, LifeLock maintains the ability to continue to perpetuate false statements about its ability to monitor and prevent identity theft in violation of the FTC Permanent Injunction, Arizona consumer protection law, and the terms of the contract with consumers.

## PARTIES

11. Plaintiff Joe Weingarten resides in Fishers, Indiana and is a citizen of the State of Indiana.

12. Plaintiff Darrell Hunter resides in Frankton, Indiana and is a citizen of the State of Indiana.

13. Defendant LifeLock is a citizen of Delaware because it is a Delaware corporation and is a citizen of Arizona because it maintains its principal place of business at 60 East Rio Salado Parkway, Suite 400, Tempe, Arizona 85281.  LifeLock conducts business throughout the United States.  It is currently estimated that LifeLock provides identity theft services to over 4 million subscribers.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, which, inter alia, amends 28 U.S.C. § 1332 to add subsection (d), which confers jurisdiction over class actions where, as here, "any member of a class is a citizen of a State different from any other Defendant," and the aggregated amount in controversy exceeds five million dollars, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2) and (6).

4

15.     This Court has personal jurisdiction over Defendant because it is a citizen of Arizona and is "at home" in Arizona, as it maintains its principal place of business in Arizona.

16.     Defendant resides in this District, and thus venue here is proper under 28 U.S.C. § 1391.

## COMMON FACTUAL ALLEGATIONS

**I.     LifeLock's Relationship with Its Subscribers**

17.     LifeLock markets, offers, and sells the following fee-based membership plans to consumers (collectively referred to as the "Membership Plans"):  LifeLock Standard, LifeLock Advantage, and LifeLock Ultimate Plus.

18.     LifeLock Standard purports to offer identity theft detection and alerts within its network, lost wallet protection, address change verification, black market website surveillance, reduced pre-approved credit card offers, privacy monitor, and a $1 million total service guarantee for $9.99 per month.

19.     LifeLock Advantage purports to offer LifeLock Standard services plus fictitious identity monitoring, court records scanning, data breach notifications, credit reports and scores, credit card activity alerts, checking and savings account activity alerts, and a $1 million total service guarantee for $19.99 per month.

20.     LifeLock Ultimate Plus protection purports to provide LifeLock Advantage services plus checking and savings account application alerts, bank account takeover alerts, investment account activity alerts, credit inquiry alerts, additional credit reports and scores, monthly credit score tracking, file sharing network searches, sex offender registry reports, priority live member service support, and a $1 million total service guarantee for $29.99 per month.

21.     Each of LifeLock's Membership Plans is governed by LifeLock's Service Terms and Conditions, which specifically provide that

> These LifeLock Service Terms and Conditions (the "Service Terms") are a legally binding agreement between LifeLock, Inc. ("LifeLock," "we" "our" or "us") and you ("you," "your"

or "yours"), and describe the terms under which you agree to use the LifeLock identity programs, including any applicable Stolen Identity Insurance (the "Protection Programs"), credit monitoring service (the "Credit Monitoring Service") and any other service or product which may be made available to you by us for which you have registered or enrolled or have been registered or enrolled by an authorized third party (collectively the "Services" and individually a "Service").

22.     In addition, the Service Terms provide as follows:

The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

23.     In sum, LifeLock customers are charged and pay between $10 and $30 dollars a month in Membership Fees for the Company to monitor their identities and to provide identity theft victim assistance, but as discussed, LifeLock falsely and misleadingly advertises and sells its services and does not provide the promised services.

## FACTUAL ALLEGATIONS SPECIFIC TO NAMED PLAINTIFFS

A.      Plaintiff Joe Weingarten

24.     After viewing several of LifeLock's pervasive television and online advertisements, Plaintiff Joe Weingarten became a member of LifeLock on March 18, 2016. Since his enrollment, and based on LifeLock's representations and promises, Plaintiff Weingarten has paid LifeLock a fee of approximately $10 per month for LifeLock's Standard Plan.

25.     In March or April 2017, an identity thief opened a credit card with Bank of America in Plaintiff Weingarten's name and tried to open an account with the Navy Credit Union using his identity. The identity thief also successfully submitted a change of address for Plaintiff Weingarten with the USPS. LifeLock did not alert Plaintiff Weingarten of any of these three events.

26.     As a result of a notification from Bank of America, Plaintiff Weingarten was able to stop the Bank of America credit card and inform the USPS of the illegal change of address.

6

27.     After receiving the notification from Bank of America, Plaintiff Weingarten obtained a credit report from Experian and discovered that the identity thief had tried to open an account with Navy Federal Credit Union.

28.     That Experian credit report also revealed that the identity thief tried to change Plaintiff Weingarten's address with Experian. LifeLock did not notify Plaintiff Weingarten of this address change linked to Plaintiff Weingarten's identity.

29.     When Plaintiff Weingarten notified LifeLock about these multiple events of identity theft, the LifeLock representative tried to sell Plaintiff Weingarten a more expensive LifeLock plan instead of talking to Plaintiff Weingarten about or providing the services outlined on LifeLock's website, such as identity theft restoration and reimbursement for losses.

30.     Plaintiff Weingarten also had two checks stolen, one of which he stopped with a $35 fee and another that was used to purchase merchandise through eBay. LifeLock did not notify him of any of these identity theft events.

31.     On April 11, 2017, Plaintiff Weingarten checked the Alerts section of his LifeLock account and the only alerts on his account were from July and August 2016:



32.     On April 11, 2017, Plaintiff Weingarten checked the ID Restoration portion of his LifeLock account and it listed no active cases, although multiple instances of

identity theft had taken place over a month before, and Plaintiff Weingarten had personally reported those instances to LifeLock the previous week:



33.     On April 29, 2017, Plaintiff Weingarten's TDCard credit card was not accepted at Kroger. Plaintiff Weingarten called TDCard and discovered an identity thief had entered a change of address on Plaintiff Weingarten's account, the USPS had returned Plaintiff Weingarten's mailed statement to TDCard, and, as a result, TDCard froze Plaintiff Weingarten's account. LifeLock did not notify Plaintiff Weingarten of this change of address on his credit card account or of the freeze placed on Plaintiff Weingarten's card by the TDCard.

34.     On May 8, 2017, Plaintiff Weingarten received a Bank of America Health Savings Account debit card in his name in the mail for which he did not apply. Bank of America received an application in his name for that card on May 3, 2017. Bank of America stopped that card based on Plaintiff Weingarten's alert to them. LifeLock did not notify Plaintiff Weingarten of this identity theft event.

B.     Plaintiff Darrell Hunter

35.     After seeing many of LifeLock's television commercials and further investigating the company's services online, Plaintiff Darrell Hunter became a member of LifeLock in 2014 or 2015. Since his enrollment, and based on LifeLock's representations

1    and promises, Plaintiff Hunter pays LifeLock a fee of approximately $22.50 per month for

2    LifeLock's Ultimate Plan. Plaintiff Hunter's wife pays LifeLock a fee of approximately

3    $25.00 per month for LifeLock's Ultimate Plan.

4         36.    On August 8, 2017, Plaintiff Hunter was alerted by LifeLock of an "Address

5    Change Notification USPS – Redirect Mail." The alert listed the USPS as its "Data

6    Source" and placed the alert category as "Public Records – Address Change." The alert

7    listed the "Move Date" as July 1, 2017, or nearly 40 days prior to LifeLock's notice. The

8    LifeLock alert also noted that "[i]f you did not submit this request, contact the post office

9    immediately for resolution."

10        37.    On August 14, 2017, and August 22, 2017, Plaintiff Hunter received another

11   alert from LifeLock that was identical to the alert he received on August 8, 2017.

12        38.    Plaintiff Hunter also received an alert from LifeLock entitled "Address

13   Change Notification Found on your TransUnion Credit Report." It informed Plaintiff

14   Hunter to "contact TransUnion immediately or file an online dispute."

15        39.    Plaintiff Hunter also received an altert of "Credit Inquiry Alert Found On

16   Your Experian Credit Report" from LifeLock that informed Plaintiff Hunter that on

17   January 3, 2017, CBNA made a "Bank – credit card" inquiry on his Experian credit

18   report. Plaintiff Hunter informed LifeLock that he did not apply for a CBNA credit card

19   and clicked "No, this was not me" in his LifeLock online account. However, LifeLock did

20   nothing in response. Indeed, when Plaintiff Hunter applied for a mortgage several months

21   later in Summer 2017, the issue had not been resolved and Plaintiff Hunter's bank

22   mortgage provider required a letter from LifeLock explaining that it had not yet corrected

23   the issue.

24   **II.   LifeLock's History of Marketing, Offering, and Selling Its Products to
          Consumers in an Unfair, Misleading, and Deceptive Manner.**

25

26        A.    LifeLock's Claim of Offering "Comprehensive" Services Grossly
                Misrepresented the Scope and Effectiveness of Its Network

27        40.    In 2008, the FTC filed suit against LifeLock alleging that the Company's

28   services did not prevent identity theft, as represented, and did not provide many of the

protections claimed by LifeLock. In resolution of the claims brought by the FTC, LifeLock and the FTC entered into the FTC Permanent Injunction, wherein LifeLock was "permanently restrained and enjoined" from the following:

A.   **in connection with the advertising**, distributing, promoting, offering for sale, or sale of any product, service, or program designed for the purpose of preventing, mitigating, or recovering from any form of identity theft as defined in 18 U.S.C. § 1028, **misrepresenting in any manner, expressly or by implication:**

1.   that such product, service, or program provides complete protection against all forms of identity theft by making customers' personal information useless to identity thieves;

2.   that such product, service, or program prevents unauthorized changes to customers' address information;

3.   that such product, service, or program constantly monitors activity on each of its customers' consumer reports;

4.   that such product, service, or program ensures that a customer will always receive a phone call from a potential creditor before a new credit account is opened in the customer's name;

5.   **the means, methods, procedures, effects, effectiveness, coverage, or scope of such product, service, or program;**

6.   **the risk of identity theft to consumers;**

7.   **whether a particular consumer has become or is likely to become a victim of identity theft; and/or**

8.   the opinions, beliefs, findings, or experiences of an individual or group of consumers related in any way to any such product, service, or program.

Such products, services, or programs include, but are not limited to, the placement of fraud alerts on behalf of consumers, searching the internet for consumers' personal data, monitoring commercial transactions for consumers' personal data, identity theft protection for minors, and guarantees of any such product, services, or programs.

B.   misrepresenting in any manner, expressly or by implication, the manner or extent to which they maintain and protect the privacy, confidentiality, or security of any personal information collected from or about consumers.

(Emphasis Added.)

B.   LifeLock Settled a Contempt Action with the FTC for Violating the FTC Permanent Injunction.

41.   In July 2015, the FTC filed a contempt action against LifeLock for violating the FTC Permanent Injunction.

42.   Specifically, the FTC alleged the violations included, among others, "falsely advertising that it protected consumers' sensitive data with the same high-level safeguards as financial institutions" and "falsely claiming it protected customers' identity 24/7/365 by providing alerts 'as soon as' it received any indication there was a problem." *See FTC v. LifeLock, Inc.*, No. 2:10-cv-530-JTT, ECF No. 67 at 2 (D. Ariz. Jan. 4, 2016). LifeLock "neither admit[ted] nor denie[d]" those allegations, but instead agreed to settle the contempt action by entering into an agreed order modifying the permanent injunction. *Id.*

III.   **LifeLock Continues to Materially Misrepresent the Scope of its Services.**

A.   LifeLock Materially Misrepresents the Scope of its Bank and Credit Card Activity Alerts.

43.   The FTC Permanent Injunction not only forbids LifeLock from making directly false statements about its product, but also prohibits LifeLock from "misrepresenting in any manner, expressly or by implication."[1] It is axiomatic that for LifeLock to provide a meaningful service to customers related to bank and credit card activity, then LifeLock must monitor or otherwise have access to information from a wide range and large number of banks and credit card issuers. If LifeLock only was able to learn about a new account opening at a limited number of financial institutions, then the level of protection provided to its plan members would be correspondingly small.

44.   Indeed, upon information and belief, the number of banks and credit card issuers that LifeLock monitors or about which it otherwise learns of new credit applications is exceedingly small. The impact of this tiny network is that plan members do not have the level of protection against identity theft that LifeLock purports to offer. If a

---

[1] *Federal Trade Commission v. LifeLock, Inc., et al.*, 2:10-cv-530-NVW, ECF No. 9, at 4 (D. Az. Mar. 15, 2010).

LifeLock plan member has his or her personal information stolen and used at a bank that LifeLock does not monitor, i.e., Bank of America or Navy Federal Credit Union, then the LifeLock coverage provides no protection whatsoever. While LifeLock advertises that its customers are protected, the scope of the financial institutions it monitors is so small as to make those representations false and misleading.

      B.    <u>LifeLock Materially Misrepresents the Scope of its Change-of-Address Monitoring.</u>

    45.    LifeLock recognizes that "[i]dentity thieves try to divert mail to get important financial information." (https://www.LifeLock.com/products/LifeLock-standard/ (last visited Feb. 22, 2018).)

    46.    LifeLock's website details the risk consumers face when an identity thief changes their address:

> Change of address theft is when thieves steal your personal information by literally changing your address to an address used by them. The end result is all of your personal identity information is forwarded directly into the hands of eagerly waiting thieves.

> **How Does Change of Address Theft Occur?**

> The U.S. Postal Service processes over 563 million pieces of mail every day, giving identity thieves plenty of opportunity to capture your information using your mail. Typically, thieves first start by collecting addresses, either online, through the phone book, or driving by homes. Then they simply complete a change of address form, easily available online or at the local post office, and reroute all of your mail to their hands.

> **How Effective is Change of Address Theft?**

> The change of address theft method was the number one way identity thieves were able to take over existing accounts in 2010.

> **Information thieves can collect:**

> - Pre-approved card and loan offers
> - Social security number
> - Telephone numbers
> - Email address
> - Bank account information
> - Employment history and information
> - Other personal information

> **What thieves can do with this information:**

> - Identity theft
> - Employment-related fraud

- Loan fraud/payday loan fraud
- Bank fraud
- Benefits fraud
- Tax fraud
- Other identity fraud

**Change of Address Statistics:**

- Over 584 million pieces of mail are processed daily by the US Post Office.
- Using change of address forms was the #1 method of account takeover.

(https://www.LifeLock.com/education/819/ (last visited Feb. 21, 2018) (citing

http://www.usps.com/communications/newsroom/postalfacts.htm; Javelin Strategy &

Research. "2011 Identity Fraud Survey Report," February 2011; Federal Trade

Commission, "Consumer Sentinel Network Data Book For January – December 2011,"

February 2012; Javelin Strategy & Research. "2012 Identity Fraud Report: Social Media

and Mobile Forming the New Fraud Frontier." February 2012).)

47.     LifeLock's website further explains:

There are ways to commit identity theft offline.

With a name and address, a thief can change your address via U.S. Postal Service and redirect mail to their address of choice . . . . With access to your financial mail, the thief may intercept bank statements and credit card offers or bills, then order new checks and credit cards.

This is a form of mail theft.

(https://www.LifeLock.com/education/can-your-identity-be-stolen-with-only-a-name-and-

address/ (last visited Feb. 21, 2018).)

48.     Because mail theft is a particularly damaging form of identity theft, and

therefore protecting against it is crucial to consumers, LifeLock promises to provide

"Address Change Verification" for each of its three plans. LifeLock further promises to

monitor "change of USPS mailing address requests."

49.     For each of its three plans, LifeLock explicitly promises the following with respect to detecting and alerting its Membership Subscribers of address identity theft, as well as other identity-theft related incidents:

    a.  "LifeLock lets you know of changes in address requests linked to your identity."

    b.  "Our products help detect identity-related incidents, alert our members to suspicious activity and address identity theft-related issues on behalf of victims."

    c.  "We proactively monitor identity-related events . . . . Alerts are sent to our members through our patented LifeLock Identity Alert® system."

    d.  "LifeLock uses proprietary technology that searches for potential threats to your identity. If we see activity using your personal information, we alert you. If it's not you, we go to work on your behalf."

    e.  "Our proprietary technology scans millions of transactions every second for threats to your identity."

50.     LifeLock states that when it discovers a change of address, it will send the customer an email or text-message alert; or for customers who have chosen to receive telephone alerts, LifeLock represents it will call the customer during local business hours.

51.     The USPS provides access to its change-of-address data via its NCOALink Production, which is "a secure dataset of approximately 160 million permanent change-of-address (COA) records consisting of names and addresses of individuals, families and businesses who have filed a change of address with the Postal Service. The NCOALink data is provided on a regular basis to companies that have been licensed by the Postal Service." (https://postalpro.usps.com/mailing-and-shipping-services/NCOALink (last visited Mar. 7, 2018).)

52.     The USPS lists its "Full Service Provider Licensees" that receive "48 months of change-of-address (COA) data from the USPS® on a weekly basis."

(https://postalpro.usps.com/ncoalink/Full_Service_Provider_Licensees (last visited Mar. 7, 2018).) LifeLock is not listed as a "Full Service Provider Licensee."

53.     The USPS lists its "Limited Service Provider Licensees" that receive "18 months of change-of-address (COA) data from the USPS® on a weekly basis." (https://postalpro.usps.com/ncoalink/Limited_Service_Provider_Licensees (last visited Mar. 7, 2018).) LifeLock is not listed as a "Limited Service Provider Licensees."

54.     Therefore, LifeLock does not directly purchase change-of-address data from the USPS.

55.     The USPS states that commercial customers, like perhaps LifeLock, can purchase change-of-address data from the licensed USPS service providers on a daily, weekly, monthly, quarterly, or annual basis.

56.     It is not clear from where, or even if, LifeLock purchases USPS change-of-address data, but it is clear that LifeLock does not purchase it from the USPS, but instead (if at all) from a third party; and LifeLock can only obtain that data on a weekly, monthly, quarterly, or annual basis, not contemporaneously or even daily.

57.     Moreover, on information and belief, LifeLock either simply does not deliver USPS change-of-address alerts to customers who purchased its Standard Plan or does so only sporadically.

58.     For customers with more expensive plans, LifeLock allows weeks, if not months, to elapse before it delivers the change-of-address alerts, either because it does not even have the information or because it chooses to delay the alerts or does not have the capacity needed to send the alerts out more frequently.

59.     In either situation, LifeLock delivers nothing approaching the nearly contemporaneous alerts and "protection" it and its affiliates advertise.

60.     This is likely because nearly 15 percent of Americans move each year. A relocation requires the consumer to change her address with the USPS, the credit bureaus, and for her many accounts (credit cards, banks, loans, etc.). LifeLock boasts that it has 4.4 million subscribers, so each year on average, 660,000 LifeLock Subscribers move, which

should trigger millions of alerts by LifeLock to its Subscribers if it was fully delivering on its advertised promise.

61.     Numerous customers, however, have complained online that LifeLock did not notify them of address changes:

> Find 2 derogatory accounts on my credit reports (that are not mine). Find home addresses that are not mine on my credit reports. Hmmm, you'd think LifeLock would have noted these events and alerted me. Nope, they didn't.

> You failed to pick notice an address changes in my family - (first step in having someone commit fraud against you) THANKS FOR NOTHING! Years of charging me and then you were asleep at the wheel!

> I subscribed to LifeLock last year under the impression that, as advertised, the company would notify me if there was activity using my personal information in order to detect possible identity fraud. Since that time I have moved and changed the address on almost all credit accounts, had credit approved for a lease for a rental, purchased a vehicle, and who knows what else as I went through a divorce. In that entire time I NEVER received a notice there was activity using my personal information, although that is exactly what the company had advertised it would do. When I talked to a company representative, I was told those banks aren't in our network and car loans aren't always counted…

> I have been a LifeLock Customer since early 2010. Since then, I have opened four credit cards and Life lock had no idea. No alert, no nothing. I had gotten letters from the local PD of two Sex offenders in the area which LifeLock missed. I moved to another state, new D.L., new car - which I financed. Was I contacted by LifeLock? NOPE.

> I have been a member (and my family of 5) for over 10 years. I have not received an alert since 2013. Since then I have bought and sold two houses, opened 2 business, lines of credit, credit cards with large limits and I have never received an alert. When I ask LifeLock they give me the same speech - "We don't partner with all institutions." I get free alerts monthly with AAA. I am about ready to cancel.

C.     LifeLock Misrepresents the Services It Provides Once Identity Theft Occurs

62.     While LifeLock makes promises about its abilities to prevent identity theft that it cannot fulfill, LifeLock further fails to honor its obligations (via advertising and the customer agreement) with respect to helping its customers who have fallen victim to identity theft by covering their associated out-of-pocket expenses and reimbursing stolen funds.

16

63.     In its plans, LifeLock touts its "Million Dollar Coverage." This feature purportedly provides coverage for stolen funds and out-of-pocket expenses of up to $25,000 for Standard Plan Members, $100,000 for Advantage Members, and $1,000,000 for Ultimate Plus members.

64.     Specifically, LifeLock represents it will cover its members "for personal expenses incurred as a result of identity theft, up to the limits of your plan."

65.     Similarly, LifeLock promises that "[i]f your money is stolen due to ID theft, we will reimburse you up to the amount provided by your plan."

66.     LifeLock further promises to its customers that "if you're ever victimized by identity theft…a member of our U.S.-Based Identity Restoration Team will be dedicated to your case." (https://www.lifelock.com/how-it-works/overview/ (last visited Mar. 14, 2018.)

67.     As discussed above, Plaintiff Weingarten incurred out-of-pocket expenses cancelling his stolen checks. Similarly, LifeLock assigned no member of its Restoration Team to investigate and help remediate the multiple instances of identity theft Plaintiff Weingarten reported in 2017.

68.     Thus, in addition to not providing Plaintiff Weingarten alerts of the many instances in which his identity was stolen, LifeLock made no efforts to investigate those instances or attempt to alleviate their financial toll.

D.      LifeLock Misrepresents Its Services Using Affiliate and Shadow Websites

69.     LifeLock was able to perpetuate its maze-like services through use of its "affiliates."  As part of its marketing campaign, LifeLock uses an affiliate program whereby people and/or businesses create websites and blogs that link to LifeLock.com. The affiliates receive a commission on each enrollment generated from their site or review. Thus, LifeLock's affiliates were incentivized to perpetuate LifeLock's advertising and marketing scheme and mislead consumers.

70.     On information and belief, LifeLock reviews the materials its affiliates intend to post to ensure it conforms with LifeLock's advertising guidelines and, if satisfied the materials so conform, approves the "neutral" advertisements for display.

71.     One such affiliate is Identity Theft Labs, a website which claims for itself "a stellar reputation as the leading and most trusted source for professional reviews of the **best identity protection companies**." (https://www.identitytheftlabs.com/?gclid=CjwKCAiA8vPUBRAyEiwA8F1oDKqx-3j07fDVjhv3AsiDUrtwVIjfyX2OrGN674A4mr0tQ-1tgre1IhoCjRUQAvD_BwE (last visited Mar. 5, 2018) (emphasis in original).)

72.     According to this "most trusted source," LifeLock "monitors 1000s of databases and trillions of data points" to provide its customers "**early notification** of potential identity threats."

73.     Identity Theft Labs further assures its readers that "LifeLock **alerts you** by text, email and/or phone (Phone alerts made during normal local business hours) **whenever their system detects your personal information being used** to apply for many forms of credit cards, wireless services, retail credit, utilities, check orders/reorders, mortgage loans, auto loans, and non-credit related payday loans."

74.     Another "neutral" affiliate that shills for LifeLock is Identity Theft Protection Bureau. This affiliate is particularly pernicious, because ITPB represents its team as true subject-matter experts with "extensive experience in the identity theft industry and [who] are experts in information security." (http://www.itpbureau.com/about-us/ (last visited Mar. 5, 2018).)

75.     In their review of LifeLock, ITPB's "experts in information security" make many of the extravagant claims that LifeLock has been enjoined from making as misrepresentations.

76.     For instance, ITPB praises LifeLock's "ID Network," which "covers close to 100% of Americans monitoring over a trillion data points and spanning all industries

from cell phone applications to ecommerce transactions to **change of address**."
(Emphasis added.)

77.     This "Real Time Data," ITPB continues, gives LifeLock "an up-to-the-minute view of event, consumer, and identity risk."

78.     LifeLock's up-to-the-minute data, in turn, fuels its "best in class alerts," through which LifeLock "notifies customers of identity misuse."

79.     Further stoking customers' expectations that these alerts occur in real time and might actually prevent identity theft—instead of providing a mere after-the-fact announcement—ITPB misinforms customers that an alert is "not just an alert as these notifications are interactive and require the customer (you) to verify the transaction." Put another way, ITPB represents that a customer could choose not to verify the transaction and thwart the would-be identity thief.

80.     Worse still, LifeLock maintains, either itself or through affiliates, a series of shadow websites that use LifeLock's insignia and appear as though they are maintained by LifeLock.

81.     LifeLock.**org**—as opposed to the official website LifeLock.**com**—is a prime example of this practice. On that website, LifeLock represents without compunction that its "theft protection services help prevent all forms of identity theft." Moreover, this website states LifeLock's "[t]echnology monitors and alerts members to threats to their personal information to help stop identity theft before it happens."

82.     Another shadow website through which LifeLock misrepresents its services is LifeLock.identity-protection.org. This website bears LifeLock's insignia and contains no disclaimer that it is independent of LifeLock.

83.     On this website, LifeLock touts its "proactive identity theft protection services[.]" Importantly, unlike some others, LifeLock on this site represents it provides its customers contemporaneous alerts of potential identity theft—regardless of whether the customer has elected to receive the alert by phone, email, or text message.

**IV.     LifeLock Breached Its Contractual Obligations.**

77.     Through its advertising, website, and Service Terms, LifeLock promised Plaintiffs and Class members that LifeLock would protect their identity by, among other things, alerting them to address changes linked to their identity.

78.     Plaintiffs and the Class members accepted LifeLock's offer and provided consideration through payment of Membership Fees.

79.     Plaintiffs and the Class members' contracts with LifeLock all contain the following provisions:

> These LifeLock Service Terms and Conditions (the "Service Terms") are a legally binding agreement between LifeLock, Inc. ("LifeLock," "we" "our" or "us") and you ("you," "your" or "yours"), and describe the terms under which you agree to use the LifeLock identity programs, including any applicable Stolen Identity Insurance (the "Protection Programs"), credit monitoring service (the "Credit Monitoring Service") and any other service or product which may be made available to you by us for which you have registered or enrolled or have been registered or enrolled by an authorized third party (collectively the 'Services" and individually a "Service").

> The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

Accordingly, class-wide application of Arizona law is appropriate.

80.     In the Service Terms, LifeLock itself acknowledges that its website promises regarding its Membership Plans are incorporated into the Service Terms.

81.     LifeLock breached its contract with Plaintiffs and the members of the Class by: (1) failing to notify LifeLock Standard Members, and perhaps others, of address changes, (2) failing to notify LifeLock Advantage and Ultimate Plus Members of address changes as promised, and by (3) making material misrepresentations about LifeLock's Services.

82.     Over 4 million people paid between $10.00 and $30.00 per month for a service LifeLock promised, but did not—and could not—provide. Because LifeLock broke that promise, those who subscribed to LifeLock's products at worst were left

unprotected and suffered further harm, and at best were paying for a service that they were not receiving.

83.     Specifically, LifeLock promised to monitor the USPS's change-of-address data, and other address-change data linked to the customer's identity, and provide timely alerts when an address change was initiated for a LifeLock customer.

84.     LifeLock does not directly purchase change-of-address data from the USPS and lacks any means of providing anything close to a timely alert of an address change.

85.     Furthermore, LifeLock altogether refused to provide those alerts, or did so only sporadically, to members of LifeLock's Standard Plan and thus dishonored that obligation to a whole segment of its customers.

86.     And for those who purchased the more expensive LifeLock plans, LifeLock provided nothing approximating timely notice of address changes. Indeed, LifeLock's alerts could come weeks after someone initiated the address change, much too late to make the alert a tool in preventing identity theft.

87.     In sum, LifeLock fails to make good on its promises to its consumers. And in exchange, over 4 million subscribers pay LifeLock up to $30.00 a month, believing they are protected when in fact they are getting nothing in return.

## FRAUDULENT CONCEALMENT AND TOLLING

88.     The applicable statutes of limitations are tolled by virtue of Defendant's knowing and active concealment of the facts alleged above. Plaintiffs and Class members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

89.     At the time this action was filed, Defendant was under a duty to disclose the true, character, quality, and nature of LifeLock's services to Plaintiffs and the Class. Defendant is therefore estopped to rely on any statute of limitations.

90.     Defendant's fraudulent concealment is common to the Class.

1

## **CLASS ACTION ALLEGATIONS**

2    91.    Plaintiffs bring this action against LifeLock as a class action pursuant to

3    Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3).

4    92.    Plaintiffs seek certification of this action on behalf of the following class

5    (the "Class"): all persons in the United States who are or were, during January 21, 2016

6    through the resolution of this matter (the "Class Period") subscribers of LifeLock's fee-

7    based identity-theft protection services. Excluded from the Class are Defendant, any

8    parent, subsidiary, affiliate, or controlled person of Defendant, as well as the officers,

9    directors, agents, servants, or employees of Defendant and the immediate family members

10   of any such person. Also excluded is any judge who may preside over this cause of action.

11   93.    The exact size of the Class, as herein identified and described, is not known,

12   but it is estimated to number in the millions. The Class is so numerous that joinder of

13   individual members herein is impracticable.

14   94.    There are common questions of law and fact in the action that relate to and

15   affect the rights of each member of the Class and the relief sought is common to the entire

16   Class. In particular, the common questions of fact and law include:

17            (A)    Whether Defendant provided change-of-address alerts to members of
18                   its Standard Plan;

19            (B)    Whether Defendant was capable of providing, as promised, change-
20                   of-address alerts to members of any of its plans;

21            (C)    Whether Defendant misrepresented, either expressly or by
22                   implication, the true nature of its Bank and Credit Card Alerts;

23            (D)    Whether Defendant misrepresented, either expressly or by
24                   implication, the true nature of its services via statements made by
25                   Affiliates;

26            (E)    Whether Defendant misrepresented, either expressly or by
27                   implication, the true nature of the benefits of its Million Dollar
28                   Protection Package;

  (F)  Whether Arizona law applies to the putative Class; and

  (G)  Whether members of the Class have sustained damages, and, if so, in what amount.

95. The claims of the Plaintiffs, who are representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiffs, depend on a showing of the acts of Defendant giving rise to the right of Plaintiffs to the relief sought herein. There is no conflict between the individually named Plaintiffs and other members of the proposed Class with respect to this action or with respect to the claims for relief set forth herein.

96. The named Plaintiffs are the representative parties for the Class, and are able to, and will fairly and adequately protect the interests of the Class. The attorneys for Plaintiffs and the Class are experienced and capable in complex civil litigation, consumer fraud litigation, and class actions.

97. The class action procedure is superior to all other available methods for the fair and efficient adjudication of this controversy. This action would permit a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence and effort. Class treatment also would permit the adjudication of claims by class members whose claims are too small and complex to individually litigate against a large corporate defendant.

### COUNT I
### Violation of the Arizona Consumer Fraud Act

98. Plaintiffs repeat and reallege all preceding paragraphs contained herein.

99. Defendant sold Plaintiffs and other Class Members "merchandise" as that term is defined by A.R.S. § 44-1521, in the form of services, including alleged identity-theft protection services and all other services offered under the various plans.

100. Section 44-1522 of the Arizona Consumer Fraud Act provides:

The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation,

or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

*See* A.R.S. § 44-1522(A).

101.    LifeLock used deception, used a deceptive act or practice, and fraudulently omitted or concealed material facts in connection with the sale or advertisement of that merchandise in violation of A.R.S. § 44-1522(A).

102.    LifeLock's acts and omissions constitute material misrepresentations and concealments in connection with the sale or advertisement of its services in violation of the Arizona Consumer Fraud Act, A.R.S. § 44-1522(A).

103.    Specifically, LifeLock used false, deceptive, and misleading statements, concerning the scope and effectiveness of its services; its ability to monitor USPS data for address changes; that it provided members of its Standard Plan change-of-address alerts; and that it provided such alerts as promised to members of all its plans.

104.    Likewise, LifeLock's advertisements and website were misleading, false, and/or deceptive regarding the efficacy of LifeLock's technology and safeguards.

105.    LifeLock further omitted and/or concealed material facts. For example, LifeLock concealed the fact that it had no means of monitoring changes in address on anything approaching a continuous basis—and that any alerts of address changes would come weeks or a month later.

106.    The concealed facts are material in that they are logically related to the transactions at issue and rationally significant to the parties in view of the nature and circumstances of those transactions.

107.    As a result of LifeLock's misrepresentations and omissions, LifeLock's members paid substantial fees, were injured and sustained damages in an amount to be proven at trial. These damages include, at a minimum, payments of monthly charges for services that were not as represented, and which in many cases LifeLock had no intention of delivering.

*COUNT II*
**Breach Of Contract**

108.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

109.    In its plans and agreements with Plaintiffs and Class members, LifeLock agreed to provide Plaintiffs and the members of the Class Membership Plans and protections as advertised and promised.

110.    As set forth herein, LifeLock breached its contracts with Plaintiffs and the members of the Class by failing to provide the benefits and/or protections as promised.

111.    As a direct and proximate result of Defendant's breach, Plaintiffs and the Class are entitled to all damages arising from the breach of contract.

*COUNT III*
**Unjust Enrichment**

112.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

113.    Plaintiffs and the Class conferred monetary benefits upon the Defendant by paying Membership Fees for the promised identity theft protections and services.

114.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class members.

115.    Although LifeLock received earnings and benefits from the sale of its Membership Plans and the collection of Membership Fees from Plaintiffs and Class members, LifeLock retained these revenues under conditions that would constitute an unjust enrichment of those revenues.

116.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendant failed to provide the promised services and misrepresented its ability to provide those services.

117.    As a direct and proximate result of Defendant's actions, Plaintiffs and the Class are entitled to restitution on the full amount by which the Defendant has been unjustly enriched and should be required to disgorge same to Plaintiffs and the Class.

*COUNT IV*
**Declaratory Judgment**

118.   Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

119.   An actual case and controversy within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, which may be adjudicated by this Court exists between Plaintiffs and proposed class members, and the Defendant.

120.   Plaintiffs and all members of the proposed class have, had, or were subscribers of one of Defendant's fee-based Membership Plans. Defendant's Terms and Conditions provide that its insureds are treated consistent with the requirements of the laws and regulations of Arizona. Thus, per the governing contract, Arizona law controls how the Defendant's customers must be treated by Defendant.

121.   At the same time, the relationship between Defendant and its customers was subject to the FTC Preliminary Injunction entered between Defendant and the FTC in 2010, as amended in 2015, which specifically enjoins LifeLock from misrepresenting, expressly or by implication, "the means, methods, procedures, effects, effectiveness, coverage, or scope" of LifeLock's services.

122.   Defendant, as a general policy and business practice, represented or created the impression that LifeLock's Membership Plans provide: (a) protection from fraud or unauthorized account charges or "peace of mind"; (b) a solution to financial security; (c) live member support 24/7/365 and real-time "alerts" of any threat of identity theft; and contemporaneous monitoring of the United States Postal Service's change-of-address data.

123.   Accordingly, Defendant has violated, and continues to violate, Arizona law and the FTC Preliminary Injunction and Plaintiffs are entitled to declaratory relief.

**<u>RELIEF</u>**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

a)     determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives, and approve Plaintiffs' Counsel as counsel for the Class;

b)     enter an order demanding that Defendant pay monetary damages to the Plaintiffs, and all proposed Class members;

c)     enter an order declaring that Defendant's actions are unlawful; and

d)     grant such other legal and equitable relief as the Court may deem appropriate, including costs and attorneys' fees pursuant to A.R.S. § 12-341.01.

## <u>JURY DEMAND</u>

Plaintiffs and the Class members hereby request a trial by jury.

RESPECTFULLY SUBMITTED this 30th day of March 2018.

GALLAGHER & KENNEDY, P.A.

By: s/ Paul L. Stoller
    Paul L. Stoller
    Lincoln Combs
    2575 East Camelback Road
    Phoenix, Arizona  85016-9225

CARNEY BATES & PULLIAM, PLLC
Randall K. Pulliam
E. Lee Lowther III
519 W. 7th St.
Little Rock, AR  72201
Telephone:  (501) 312-8500
Facsimile:  (501) 312-8505

COHEN MALAD, LLP
Irwin B. Levin
Richard E. Shevitz
Vess A. Miller
Lynn A. Toops
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone:  (317) 636-6481
Facsimile:  (317) 636-2593

*Attorneys for Plaintiffs*