1  Randall K. Pulliam
   rpulliam@cbplaw.com
2  E. Lee Lowther III
   llowther@cbplaw.com
3  CARNEY BATES & PULLIAM, PLLC
   519 W. 7th St.
4  Little Rock, AR  72201
   Telephone:  (501) 312-8500
5  Facsimile:  (501) 312-8505
   (*pro hac vice* applications to be filed)
6
   Irwin B. Levin
7  ilevin@cohenandmalad.com
   Richard E. Shevitz
8  rshevitz@cohenandmalad.com
   Vess A. Miller
9  vmiller@cohenandmalad.com
   Lynn A. Toops
10 ltoops@cohenandmalad.com
   COHEN MALAD, LLP
11 One Indiana Square, Suite 1400
   Indianapolis, IN 46204
12 Telephone:  (317) 636-6481
   Facsimile:  (317) 636-2593
13 (*pro hac vice* applications to be filed)

14 Paul L. Stoller (016773)
   paul.stoller@gknet.com
15 Lincoln Combs (025080)
   lincoln.combs@gknet.com
16 GALLAGHER & KENNEDY, P.A.
   2575 E. Camelback Road
17 Phoenix, AZ 85016
   Telephone: 602-530-5000
18 Facsimile: 602-530-8500
   Counsel for Plaintiffs and the Putative Class

19                UNITED STATES DISTRICT COURT
20                      DISTRICT OF ARIZONA
21

| | |
|---|---|
| 22  Joe Weingarten and Darrell Hunter, on behalf of themselves and all others similarly situated, | Case No. 2:18-cv-01013-SRB |
| 23 | **RESPONSE IN OPPOSITION TO DEFENDANT LIFELOCK'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P 9(B) AND 12(B)(6)** |
| 24           Plaintiffs, | |
| 25  v. | |
| 26  LifeLock, Inc., | |
| 27           Defendant. | |

28

**I.     INTRODUCTION**

Defendant LifeLock, Inc., aggressively markets its identity-theft-protection services through television, radio, its own website, and "affiliates" who operate their own seemingly independent websites. Through these media, LifeLock boasts that it "covers close to 100% of Americans monitoring over a trillion data points and spanning all industries," to provide "early notification of identity threats." LifeLock's own contract documents and fine-print disclaimers, however, omit that it monitors such a tiny percentage of financial transactions as to provide its subscribers essentially no protection against identity theft. Plaintiff Joe Weingarten discovered these limitations after identity thieves opened accounts in his name with Bank of America, Navy Federal Credit Union, and TDCard, and none of those instances of identity theft prompted an alert from LifeLock. As for its promise to send change-of-address notifications, LifeLock sends them either too late to provide protection, as in the case of Plaintiff Darrell Hunter, or never sends them at all, as in the case of Plaintiff Weingarten.

LifeLock omits material limitations in its consumer-facing documents for a simple reason: No one would subscribe if LifeLock revealed its limitations. In its Motion, LifeLock repeatedly invokes its understatement that it "does not monitor all transactions at all institutions" as a cure for its material omissions. But no sophisticated reader—much less the least sophisticated reader—would glean the truth from that understatement that LifeLock monitors no transactions at the vast majority of businesses. And despite describing at length the devastating effects of mail fraud, LifeLock fails to inform its customers that it receives change-of-address information only every week, and even then sits on the information for weeks before alerting subscribers, if it ever does so.

In short, LifeLock omits material information about the nature and scope of its services and fails to provide services that it is bound by contract to provide. For these reasons, Plaintiffs have pleaded claims to relief for violations of the Arizona Consumer Fraud Act (ACFA), breach of contract, unjust enrichment, and declaratory judgment. LifeLock's motion should be denied.

## II. THE PREVIOUS LITIGATION

Although not pertinent to deciding that Plaintiffs have stated plausible claims to relief, LifeLock casts the aspersion that "[t]his lawsuit is a cynical effort to double dip on a case Plaintiffs' counsel brought in 2015." Mot. at 2. It further contends that there are no allegations in the Complaint "that LifeLock has since changed the advertising or practices that Carney Bates blessed." *Id.* But the prior class settlement did not bless any of LifeLock's activities that are the subject of this action.

The *Ebarle* case involved a class that certified and settled on four narrow claims, none of which is at issue in this litigation: LifeLock's representations that it provided "(1) 'comprehensive' services in detecting fraud, (2) timely and continuous alerts of potential fraud twenty-four hours a day every day of the year, (3) security for customers' personal data (credit card, social security, and bank account numbers), and (4) insurance in an amount up to $1,000,000 against identity theft." *Ebarle v. LifeLock, Inc.*, 3:15-cv-258-HSG, Dkt. No. 93, at *1 (N.D. Cal. Sept. 20, 2016). In the context of those specific claims, Plaintiffs' counsel observed that

> LifeLock no longer promises it will provide "continuous, uninterrupted" alerts 24 hours a day, 7 days a week, 365 days a year. Perhaps more importantly, LifeLock made several technical improvements to its systems so that it is now able to deliver alerts during planned and unplanned system outages through the use of "parallel tracks" that allow maintenance of the system on one track while alerts continue to be delivered to customers on another track.

*Id.* at Dkt. No. 60, at 20.

Moreover, while LifeLock suggests that counsel told the *Ebarle* court that LifeLock's conduct need not be enjoined, Mot. at 5, injunctive relief should not have been necessary because "LifeLock is already subject to a permanent injunction in related litigation between it and the FTC," which "prohibits LifeLock from, among other things, misrepresenting its identity theft protection service." *Id.* at 13. Nowhere did Plaintiffs' counsel "bless" the representations in this case that misled Plaintiff Weingarten or Plaintiff Hunter or the class.

2

**III.    FACTS**

      **A.**     <u>LifeLock Omits from its Consumer-Facing Representations Material Information about the Scope of Its Financial Services Monitoring.</u>

LifeLock omits from its website and other advertising materials the extremely limited scope of its financial-services monitoring. *Id.* ¶ 44. LifeLock uses several marketing channels to sell its services. In addition to advertising on television, radio, and online, LifeLock relies on a network of paid "affiliates" to generate business. *Id.* ¶¶ 69-76. These affiliates operate their own websites and are compensated if they direct a consumer to LifeLock who buys the service. LifeLock approves the content that the various affiliates put on their website and uses them as a means of evading FTC enforcement of the injunction barring LifeLock from misrepresenting, directly or indirectly, the scope of its services. *Id.* ¶ 70.

One of these affiliates is the Internet Theft Protection Bureau (ITPB). The ITPB, among other falsehoods, praises LifeLock's "ID Network" that "covers close to 100% of Americans monitoring over a trillion data points and ***spanning all industries*** from cell phone applications to ecommerce transactions to change of address." *Id.* ¶ 76. Through its purported collection of "Real Time Data," LifeLock represents through the ITPB, that it has "an up-to-the-minute view of event, consumer, and identity risk." *Id.* ¶ 77. This contemporaneous view of identity risk allows LifeLock, as it represents through the ITPB, to provide "best in class alerts" that "are interactive and require the customer (you) to verify the transaction." *Id.* ¶ 78–79.[1]

Similarly, LifeLock falsely represents through its paid affiliate Identity Theft Labs, that it "monitors 1000s of databases and trillions of data points" to provide "early notification of potential identity threats." *Id.* ¶ 72. LifeLock further falsely represents that it "alerts you . . . whenever their system detects your personal information being used to

---

[1] LifeLock takes umbrage with Plaintiffs' use of the word "contemporaneous." The word, however, well captures LifeLock's statements that it keeps a real-time, up-to-the-minute view of identity risk and sends alerts that consumers can interact with to verify a transaction.

3

apply for many forms of credit cards, wireless services, retail credit, utilities, check orders/reorders, mortgage loans, auto loans, and on-credit related payday loans." *Id*. ¶ 73.

To distance itself from the expectations it creates through its prolific advertising, LifeLock can point only to its understatements in the fine print that "no one can prevent all identity theft," and that it "does not monitor *all* transactions at *all* businesses." Mot. at 3 (emphasis added). This hedging, though, offers no intimation that LifeLock monitors *no* transactions at the *vast majority* of business or that the "trillions of data points" it scans "spanning all industries" do not cover some of the world's largest financial institutions.

As Plaintiff Weingarten discovered, the holes in LifeLock's financial-services monitoring are gaping enough to include the behemoth Bank of America and the hardly obscure Navy Federal Credit Union. *Id.* ¶¶ 25–28. Nor does LifeLock monitor financial transactions with TDCard, another financial institution at which identity thieves compromised Plaintiff Weingarten's account. *Id.* ¶¶ 33–34. Indeed, LifeLock's network from which it receives transactional information is exceedingly small and provides virtually no protection to LifeLock customers. *Id.* ¶ 44.

### B. <u>LifeLock Omits from its Consumer-Facing Representations Material Information that Exposes Its Change of Address Service As Worthless.</u>

Mail fraud is a particularly effective means of stealing a person's identity. As LifeLock informs subscribers, "[t]he end result" of mail theft is that "all of your personal identity information is forwarded directly into the hands of eagerly awaiting thieves." Compl. ¶ 46. According to LifeLock, "Using change of address forms was the #1 method of account takeover," and it allows identity thieves to "intercept bank statements and credit card offers or bills, then order new checks and credit cards." *Id.*

Against this ominous backdrop, LifeLock offers subscribers of all its plans an "Address Change Verification" service and promises to monitor for "change of USPS mailing address requests." *Id.* ¶ 47. Because detection alone cannot stop identity thieves, LifeLock represents it "uses proprietary technology that searches for potential threats to your identity. If we see activity using your personal information, we alert you. If it's not

4

you, we go to work on your behalf." *Id.* When it detects a threat, LifeLock represents it sends the subscriber an alert "through our patented LifeLock Identity Alert® system." *Id.* In LifeLock's words, the "Identity Alert System . . . It's the foundation for all LifeLock services." Mot. at 3.

The reality, however, is much less impressive and—as Plaintiffs discovered—utterly ineffective. LifeLock's "monitoring" of USPS addresses consists of nothing more than receiving periodic[2] updates from a third-party vendor of the USPS. *Id.* ¶ 55. And once it receives that information, LifeLock does not forward the information "through [its] patented LifeLock Identity Alert® system." Instead, it sits on the information. *Id.* ¶¶ 57–59. When Plaintiff Hunter initiated a change of address, LifeLock let 40 days pass before it alerted him. When an identity thief changed Plaintiff Weingarten's address, LifeLock failed to alert him at all.

LifeLock advertises a service to alert its customers to help counteract the effects of mail fraud, a service which requires timeliness to be effective. But LifeLock, in truth, provides a service that *at best* lags so far behind would-be identity thieves as to be worthless. LifeLock omits from its advertisements and contractual materials these material limitations in its services.

### IV. PLAINTIFFS HAVE PLEADED NO CLAIMS THAT SOUND IN FRAUD, AND RULE 9(b) IS INAPPLICABLE.

To prevail on a motion to dismiss for failure to state a claim, plaintiffs do "not need detailed factual allegations" but must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must "accept as true the facts alleged in the complaint" and "draw inferences in the light most favorable to the plaintiff." *Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009).

---

[2] In its Answer, LifeLock states it receives weekly updates through a third-party data vendor of the USPS change of address updates. Ans. ¶ 56.

5

1    Even if defendants put forward an alternative explanation for their alleged misconduct, the
2    "tie goes to the plaintiffs." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d
3    990, 999 n.8 (9th Cir. 2014).
4         In cases, such as this one, where the misrepresentations that violate the Arizona
5    Consumer Fraud Act take the form of omissions, plaintiffs face a "more relaxed burden,
6    due to the fraud-by-omission plaintiff's inherent inability to specify the time, place, and
7    specific content of an omission in quite as precise a manner." *Schellenbach v.
8    GoDaddy.com, LLC*, 2017 WL 192920, at *2 (D. Ariz. Jan. 18, 2007). Plaintiffs' fraud-
9    by-omission claim requires only enough specificity "to give Defendant notice of the
10   alleged misconduct constituting fraud." *Overton v. Bird Brain, Inc.*, 2012 WL 909295, at
11   *6 (C.D. Cal. Mar. 15, 2012).
12        Moreover, Plaintiffs claims for breach of contract, unjust enrichment, and
13   declaratory judgment need not meet the standard of Rule 9(b). None of those claims
14   involve fraud as an element. For breach of contract, Plaintiffs have adequately pleaded
15   they had a contract with LifeLock for identity-protection services, and LifeLock did not
16   provide those services. The same applies for the unjust enrichment claim, where Plaintiffs
17   allege LifeLock accepted their money without providing the services to which they were
18   entitled. And as for the claim for declaratory judgment, Plaintiffs have alleged several
19   statements showing that LifeLock continues to make false representations in violation of
20   the FTC injunction. Importantly, LifeLock admits "it has approved certain marketing
21   content of certain entities with which it has an agreement," and that it has an agreement
22   with each affiliate named in the Complaint. Ans. ¶¶ 70, 71, 81, 82 & 84.
23        "[W]here fraud is not an essential element of a claim, only allegations . . . of
24   fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." *Vess
25   v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). For claims, such as
26   breach of contract, that do not require averments of fraud, a failure to plead fraud with
27   particularity means only that the Court should "disregard averments of fraud not meeting
28   Rule 9(b)'s standard and then ask whether a claim has been stated" under the standard of

6

Rule 8. *Id.* (internal citation omitted). Plaintiffs have pleaded ample facts to meet their pleading burden, and LifeLock's motion should be denied.

## V. ARGUMENT

### A. Plaintiffs Have Pleaded a Claim under the Arizona Consumer Fraud Act for LifeLock's Material Misrepresentations and Omissions.

LifeLock conceals from its consumers the exceedingly limited scope of its financial-services monitoring. LifeLock repeatedly invokes its disclaimer that it "does not monitor *all* transactions at *all* financial institutions" as a balm for these omissions. While a technically correct understatement, it omits the crucial information that LifeLock monitors *no transactions* at *the vast majority* of financial institutions. Moreover, LifeLock represents to its subscribers that it monitors the USPS for changes in address and sends alerts when changes are detected. LifeLock, however, omits the material information that, if it alerts customers at all about such changes, it does so only after weeks elapse. For these reasons, Plaintiffs have alleged facts sufficient to state claims under the ACFA, and LifeLock's motion should be denied.

The Arizona Consumer Fraud Act forbids "[t]he act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby[.]" A.R.S. § 44-1522. Deceptive representations under the Act are those that have "a tendency and capacity to convey misleading impressions to consumers even if interpretations that would not be misleading also are possible." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 826 (D. Ariz. 2016) (quoting *Madsen v. W. Am. Mortgage Co.*, 694 P.2d 1228 (Ariz. App. 1985)) (internal quotation marks omitted). "The meaning and impression are to be taken from all that is reasonably implied, not just from what is said, and in evaluating the representations, the test is whether the least sophisticated reader would be misled." *Madsen*, 694 P.2d at 1232

7

(internal citations omitted). "Technical correctness of the representations is irrelevant if the capacity to mislead is found." *Id.* In cases, such as this one, where the misrepresentations take the form of omissions, plaintiffs face a "more relaxed burden, due to the fraud-by-omission plaintiff's inherent inability to specify the time, place, and specific content of an omission in quite as precise a manner." *Schellenbach*, 2017 WL 192920, at *2.

LifeLock violated the ACFA by omitting material information about the meager scope of its financial-services monitoring. For all plans, LifeLock promises its "products help detect identity-related incidents, alert our members to suspicious activity and address identity theft-related issues on behalf of victims." Compl. ¶ 49.b. LifeLock purports to be able to provide these alerts because it "proactively monitor[s] identity-related events" using its "proprietary technology [that] scans millions of transactions every second for threats to your identity." *Id.* ¶¶ 49.c. & e. LifeLock cites these services to tout itself as "a leading provider of 'identity theft protection' services," which include "alert services that notify members when certain threats to their identities are detected[.]" Mot. at 2.

To the most sophisticated and least sophisticated reader alike, these representations create a misleading impression that LifeLock monitors a broad enough swath of financial institutions to provide a meaningful network of security. As Plaintiff Weingarten discovered, the holes in LifeLock's alert network are so gaping that the millions of transactions LifeLock claims to scan every second do not include transactions at financial giant Bank of America, Navy Federal Credit Union, and TDCard or the overwhelming majority of banks and retailers where identity theft occurs. No sophisticated reader—much less the "least sophisticated reader"—would interpret LifeLock's fine-print hedging that it "does not monitor all transactions at all institutions" to include some of the largest, most well-known financial institutions in the world.

Plaintiffs are not alone in interpreting LifeLock's representations as offering a robust network of financial institutions. The Internet teems with reviews from bilked LifeLock subscribers describing credit-card openings and other significant financial

1  transactions LifeLock failed to detect. *Id.* ¶ 61. These experiences show LifeLock offers
2  nothing approaching the collection of "Real Time Data" derived from scanning "trillions
3  of data points" that enable it to have an "up-to-the-minute view of event, consumer, and
4  identity risk" to send "early notification of potential identity threats." *Id.* ¶¶ 72, 73, 76–78.

5  LifeLock further omits material information concerning the frequency of its
6  change-of-address alerts. On its website, LifeLock describes in detail the opportunities
7  mail fraud affords identity thieves. To combat this threat, LifeLock purportedly "lets you
8  know of changes in address linked to your identity." *Id.* ¶ 49.a. Any reader, let alone the
9  least sophisticated one, would interpret these representations to mean that LifeLock
10 provides alerts quickly after receiving change-of-address information—because if not,
11 identity thieves would be left to engage in all the types of identity theft LifeLock
12 describes for its subscribers. As LifeLock admits, it receives change-of-address
13 information weekly and could provide somewhat timely alerts to aid its subscribers in
14 protecting their identities. But far from working to protect its subscribers against the
15 nightmare scenario it describes about mail fraud, LifeLock omits the fact that it allows the
16 change-of-address information it receives to languish—for weeks in the case of Plaintiff
17 Hunter; and to this day for Plaintiff Weingarten—before sending its "members alerts
18 through our patented LifeLock Identity Alert® system." *Id.* ¶ 49.e.

19 These omissions are material. Neither Plaintiff, nor any other consumer, would
20 subscribe to LifeLock's services if LifeLock made plain that (1) it monitors financial
21 transactions at only a sliver of institutions, which do not include many of the largest, most
22 familiar ones or (2) that it sits for weeks on warnings that its subscribers' addresses have
23 been changed.

24 In short, Plaintiffs have stated claims under the ACFA.

25      B.    <u>Plaintiffs State Claims for Breach of Contract.</u>

26 Plaintiffs also state claims for breach both of the express terms of their contracts
27 with LifeLock and of the covenant of good faith and fair dealing based on LifeLock's
28

9

promised identity-alert terms, change-of-address alert terms, and identity-restoration-and-reimbursement terms.

Promises made in advertising materials may be incorporated as terms of a separate written agreement. *In re Arizona Theranos, Inc., Litig.*, 2018 WL 1729347, at *18 (D. Ariz. Apr. 10, 2018) (citing Order re Motions to Dismiss at 30, Docket No. 139 ("As for the 'marketing materials', it may be plausible that the promises that defendants made in their advertising could be considered terms of the parties' contracts.")).

In addition to the express terms of a contract, Arizona law also implies a covenant of good faith and fair dealing into every contract. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 28 (Ariz. 2002) (en banc). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id.* "The duty arises by operation of law but exists by virtue of a contractual relationship." *Id.* The covenant "extends beyond the written words of the contract," and a party may "breach its duty of good faith without actually breaching an express covenant in the contract." *Id.* at 29; *Garza v. Gama*, 379 P.3d 1004, 1008 (Ariz. App. 2016). A party can breach this covenant "if he or she acts in a manner that denies the other party the reasonably expected benefits of the contract" or "uses discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach." *Coulter v. Grant Thornton, LLP*, 388 P.3d 834, 842 (Ariz. App. 2017) (internal quotations and citations omitted).

1. *Plaintiffs Allege a Breach of the Identity Alert Terms.*

LifeLock promised customers that it would provide them with a high-level of identity-theft protection and alerting. Compl. ¶ 49. Despite this promise, the number of financial institutions that LifeLock actually monitors for identity-related events is so exceedingly small that the company is unable to provide anywhere near the level of detection it promised or that customers reasonably expect. *Id.* ¶¶ 44, 61. Customers report that LifeLock fails to provide alerts even though customers have opened numerous credit

accounts, purchased homes and vehicles, and changed addresses over many years. *Id.* ¶ 61. Indeed, LifeLock failed to provide Plaintiff Weingarten with any alert that an identity thief had opened a credit card with Bank of America in his name and had tried to open an account with Navy Federal Credit Union using his identity (which later showed up on a credit report Weingarten obtained on his own from Experian). *Id.* ¶¶ 25–27. The paltry monitoring LifeLock provides breaches its promises to customers to provide a high level of identity-theft protection and monitoring.

Even if, as LifeLock argues, its woefully inadequate monitoring does not breach an express term of its agreement with customers, it breaches the implied covenant of good faith and fair dealing. LifeLock boldly claims that its agreement gives it absolute discretion to decide which and how many financial institutions to monitor. While a contract may allow discretion, Arizona courts recognize that such discretion is not unlimited. *Wells Fargo Bank*, 38 P.3d at 29. If its service is to be of any value to customers, and if its service is to comport with the reasonable expectations of customers, LifeLock must either disclose the paltry level of monitoring it provides, or it must monitor a sufficient number of major financial institutions for identity-related events, like account openings and changes of address. Instead, LifeLock uses its discretion to deprive customers of the reasonably expected benefits of identity-theft monitoring by choosing to monitor only an exceedingly small number of institutions and transactions, without disclosing that fact to customers. Compl. ¶¶ 8, 44. LifeLock's response that it informs customers that not all transactions may be monitored, does not relieve it of its obligation under the covenant of good faith and fair dealing to provide customers with the reasonably expected benefit of the agreement: meaningful monitoring. *See Wells Fargo Bank*, 38 F.3d at 29.

### 2. *Plaintiffs Allege a Breach of the Change-of-Address Alert Terms.*

LifeLock also "specifically promises [that] . . . 'LifeLock lets you know of changes in address requests linked to your identity.'" Compl. ¶ 49; *see also* ¶¶ 48, 83–86. LifeLock admits that it did not send Plaintiff Hunter an alert that his address had been changed with

11

the USPS until nearly 40 days after the change occurred, Ans. ¶ 36, and LifeLock does not deny that it completely failed to send Plaintiff Weingarten any alert that his address had been changed with the USPS, Mot. 15. The failure to provide *any* alert, when one was promised, was clearly a breach as to Plaintiff Weingarten. And LifeLock's decision to wait nearly *40 days* to alert Plaintiff Hunter is also a breach either of the express terms of the agreement or, at the very least, of the implied covenant of good faith and fair dealing. The entire reason for providing a change-of-address alert is to allow a customer to act promptly to prevent and address potential identity theft. LifeLock's delay in sending an alert for nearly *40 days*, particularly when it receives the change-of-address information *weekly* from the USPS, is an unreasonable use of discretion that deprives customers of the expected benefits of LifeLock's promise to provide change-of-address alerts. LifeLock's argument that it never promised "gapless and infallible service" and that it told customers that "no one can prevent all identity theft," Mot. at 15, does not relieve it of its duty to provide *expressly promised* change-of-address alerts at a prompt time when they would be of value to customers.[3]

### 3. *Plaintiffs Allege a Breach of the Identity Restoration and Reimbursement Terms.*

"LifeLock [also] represents that it will cover its members 'for personal expenses incurred as a result of identity theft,'" and LifeLock promised that "if you're ever victimized by identity theft . . . a member of our U.S.-Based Identity Restoration Team will be dedicated to your case." Compl. ¶¶ 64, 66. LifeLock breached these promises by failing to assign a member of its Identity Restoration Team to investigate and help

---

[3] LifeLock's footnote argument that its disclaimer should be enforced as if the service was a product, Mot. 14 n.10, essentially argues that it cannot be held to any of its promises because of the disclaimer. This would, of course, make the agreement fail altogether for lack of consideration. *Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 795 P.2d 1308, 1313 (Ariz. App. 1990) (holding contract failed for lack of consideration where it did not actually obligate one party to do anything). And even were the Court to adopt LifeLock's flawed analysis, LifeLock made specific contractual promises, for example to provide alerts for change of address, that trump any disclaimer about the overall inability to prevent *all* identity theft.

1  remediate the identity theft Plaintiffs reported, and LifeLock failed to reimburse for out-
2  of-pocket expenses incurred. *Id.* ¶¶ 67–68.

3  Strangely, LifeLock argues that Plaintiff Weingarten had already cured his
4  identity-theft issues by the time he called LifeLock. Mot. 15–16. But the Complaint does
5  not allege that, and in its Answer, LifeLock says that when Weingarten called on March
6  13, 2017, LifeLock told him to notify the USPS and Bank of America and that it wasn't
7  until April 8, 2017, that he stated he had done so—without any help from LifeLock. Ans.
8  ¶ 26. In fact, rather than providing helpful services when identity theft struck, LifeLock
9  tried to upsell Plaintiff Weingarten a more expensive LifeLock product. Compl. ¶ 29.
10 Moreover, even if LifeLock's claims were true, Plaintiff Weingarten's actions clearly
11 came after LifeLock had breached its obligations to him; they were actions to mitigate
12 those damages and do not diminish the breach claim.

13 LifeLock also argues that "[Plaintiff] Hunter does not allege that he asked
14 LifeLock for help," Mot. 16, but the Complaint alleges that, in response to a credit inquiry
15 alert, Plaintiff Hunter clicked "No, this was not me." Compl. ¶ 39.  LifeLock argues that it
16 would have directed Plaintiff Hunter to call LifeLock after he clicked "No, this was not
17 me," but that contradicts the Complaint and the allegation that LifeLock actually told
18 Plaintiff Hunter that *LifeLock* would be in touch with him to explain "next steps," but
19 never contacted him. *Id.* ¶ 39. Asserting that LifeLock has no obligation to provide
20 assistance unless a subscriber takes additional steps *after* reporting identity theft breaches
21 the contract and "denies the other party the reasonably expected benefits of the contract."
22 *Coulter*, 388 P.3d at 842 (internal quotations and citations omitted). Reporting a
23 fraudulent credit card application to one's identity-theft protection company is *asking for*
24 *help*. LifeLock promised that "if you become a victim of identity theft, a U.S.-based
25 Identity Restoration Specialist will be dedicated to your case from start to finish," Compl.
26 ¶ 7, but LifeLock breached this promise when it "did nothing in response" to Plaintiff
27 Hunter's report that he did not apply for a CBNA credit card, *id.* ¶ 39.
28

13

C.   Plaintiffs State a Claim for Unjust Enrichment.

The Court should reject LifeLock's argument that Plaintiffs' unjust enrichment claim must be dismissed because "LifeLock has done nothing 'unjust.'" Mot. at 16. The Complaint details how LifeLock's actions have been deceptive, misleading, and unfair to the detriment of its customers and to the unjust enrichment of LifeLock. Compl. ¶¶ 40–83. Likewise, courts in this District have previously rejected LifeLock's argument that an unjust enrichment claim must be dismissed where a contract exists, holding instead that "[w]hen a party does not receive the benefit of its bargain, it is 'free to pursue a claim for unjust enrichment.'" *Hummel v. Rushmore Loan Mgmt. LLC*, 2017 WL 6554884, at *4 (D. Ariz. Dec. 22, 2017) (citing *USLife Title Co. of Ariz. v. Gutkin*, 732 P.2d 579, 585 (Ariz. Ct. App. 1986)). And in *Adelman v. Christy*, 90 F. Supp. 2d 1034, 1045 (D. Ariz. 2000), the court distinguished *Brooks v. Valley National Bank*, 113 Ariz. 169, 174 (1976), on which LifeLock relies. There, the court explained that "[t]he language in *Brooks* . . . is misleadingly overbroad. The mere existence of a contract governing the dispute does not automatically invalidate an unjust enrichment alternative theory of recovery. A theory of unjust enrichment is unavailable only to a plaintiff if that plaintiff has already *received* the benefit of her contractual bargain." *Id.* (emphasis original) (citing *USLife*, 732 P.2d at 585); *Restatement (First) of Restitution* § 107 (1936)). Here, Plaintiffs allege they have not received the benefit of their contractual bargain with LifeLock, so they are free to proceed on an unjust enrichment claim as well. *See id.*[4]

D.   Plaintiffs Present a Valid Claim for Declaratory Relief.

LifeLock's argument that Plaintiffs' declaratory judgment claim should be dismissed because it is duplicative of other claims and would serve no useful purpose misunderstands how the claim varies from Plaintiffs' other claims. "[A] district court

---

[4] Plaintiffs are also free to plead alternatively and inconsistently at this stage. Thus, the pleading of a contract claim does not support dismissal of a claim for unjust enrichment claim. "The mere existence of a contract governing the dispute does not automatically invalidate an unjust enrichment alternative theory or recovery." *See In re Banner Data Breach Litig.*, 2017 WL 6763548, at *6 (D. Ariz. Dec. 20, 2017) (quoting *Adelman v. Christy*, 90 F. Supp. 2d 1034, 1045 (D. Ariz. 2000)).

should be careful to dismiss a declaratory judgment claim 'only when it is clear that there is a complete identity of factual and legal issues' between the declaratory judgment claim and the other counts." *Revive You Media LLC v. Esquire Bank*, 2008 WL 2164379, at *7 (D. Ariz. May 10, 2018) (internal citations omitted). In *Adelman*, 2015 WL 4874412, at *8, the court held that a request for a declaration that the plaintiffs were "entitled to recover the out-of-pocket expenses" was duplicative of a claim for damages for out-of-pocket expenses. Unlike *Adelman*, here the request is not for a declaration that Plaintiffs are entitled to any monetary relief, but that LifeLock is violating the FTC Order designed to protect consumers and that its services don't live up to how they are advertised and contracted—both issues that are not identical to the monetary relief Plaintiffs seek, but that provide their own useful guidance for how LifeLock should conduct itself.

Likewise, LifeLock's argument that Plaintiffs are not "interested parties" with respect to the FTC Order is wrong. In *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013), the plaintiffs had no "judicially cognizable interest of their own" and, instead, "attempt[ed] to invoke that of someone else." But in this case, Plaintiffs are not mere "concerned bystanders"—they are the precise group meant to be protected by the FTC Order and they have personally been harmed by LifeLock's violation of the Order. Complaint, *FTC v. LifeLock, Inc.*, 2010 WL 1944122 (D. Ariz. Mar. 9, 2010) ("Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. . . .").

## VI.  CONCLUSION

The Court should deny LifeLock's motion. In the alternative, if the Court grants LifeLock's motion in whole or in part, Plaintiffs respectfully request leave to amend.

RESPECTFULLY SUBMITTED this 26th day of June 2018.

GALLAGHER & KENNEDY, P.A.

By: */s/ Paul L. Stoller*
Paul L. Stoller
2575 East Camelback Road
Phoenix, Arizona  85016-9225

CARNEY BATES & PULLIAM, PLLC
Randall K. Pulliam
rpulliam@cbplaw.com
E. Lee Lowther III
llowther@cbplaw.com
519 W. 7th St.
Little Rock, AR  72201
Telephone:  (501) 312-8500
Facsimile:  (501) 312-8505

COHEN MALAD, LLP
Irwin B. Levin
Richard E. Shevitz
Vess A. Miller
Lynn A. Toops
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone:  (317) 636-6481
Facsimile:  (317) 636-2593

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on this 26th day of June 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/Deborah Yanazzo*